IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JOHN E. HARPER,

    Petitioner,                    No. CIV S-08-1410 FCD DAD P

    vs.

D. K. SISTO, WARDEN, et al.,

    Respondents.              FINDINGS & RECOMMENDATIONS

_____/

        Petitioner is a state prisoner proceeding pro se with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges the decision of the California Board of Parole Hearings (hereinafter "Board") to deny him parole for four years at his second parole consideration hearing held on February 7, 2007. Upon careful consideration of the record and the applicable law, the undersigned will recommend that petitioner's application for habeas corpus relief be denied.

PROCEDURAL BACKGROUND

        On November 14, 1986, a San Bernardino County Superior Court jury convicted petitioner of first degree murder with use of a firearm. (Pet. at 5.) On July 24, 1987, the trial court sentenced petitioner to an indeterminate term of twenty-seven years to life in state prison. (Id. at 5-6.)

1

The parole consideration hearing which is placed at issue by the habeas petition now pending before the court was held on February 7, 2007. (Pet., Ex. A (hereinafter "Decision")). On that date, a Board panel found petitioner not suitable for release and denied parole for four years. (Id. at 69.) Petitioner challenged the Board's decision in a petition for writ of habeas corpus filed in the San Bernardino County Superior Court on July 10, 2007. (Answer, Ex. 1.) The Superior Court rejected petitioner's claims in a reasoned decision on the merits. (Answer, Ex. 2.)

On August 21, 2007, petitioner filed a petition for writ of habeas corpus in the California Court of Appeal for the Fourth Appellate District. (Answer, Ex. 3.) That petition was summarily denied by order dated September 4, 2007. (Answer, Ex. 4.) On October 17, 2007, petitioner filed a petition for writ of habeas corpus in the California Supreme Court. (Answer, Ex. 5.) That petition was summarily denied by order dated April 9, 2008. (Answer, Ex. 6.)

On June 20, 2008, petitioner commenced this action by filing a federal petition for writ of habeas corpus.

## FACTUAL BACKGROUND

The Board described the facts of petitioner's commitment offense at the February 7, 2007 parole suitability hearing as follows:

> The victim, Harper, Rick Brown and Otto Bartel, that's B-A-R-T-E-L, were all, quotes, "friends", end quotes, in varying degrees, all involved in drugs and other nefarious undertakings. On June 9, 1985, Harper and Brown took the victim aside and told him they had just, quotes, "ripped off", end quotes, a drug dealer's house, taking food, drugs and other loot which they had stashed in the sand canyon, that's C-N-D, [sic] canyon area north of San Bernardino. They offered to split the loot with the victim if he would go with them and help them retrieve it from the canyon. They set out. On the way, Harper told the victim that once they arrived where the loot had been stashed, they could knock Brown out and split the items between themselves. He did this to gain the victim's confidence. When they reached the spot where Harper and Brown had previously planted a gun, Brown retrieved it and shot the victim once before the gun jammed. The wounded victim ran into the bushes. Brown unjammed the gun and went in after him, shooting him several more times. Harper then gained

2

> possession of the gun, picked up the victim's head by the hair and fired a fatal bullet – excuse me – into his temple. Fearing the victim was still alive, he struck him on the back of the head several times with a rock. Harper and Brown then returned to Harper's house and told Bartel what they had done, calling it, quotes, "first degree premeditated murder", end quotes. The next day, they and Bartel returned to the spot and re-enacted the offense. Harper said Brown was supposed to have waited to shoot the victim but Brown responded he could not. The three then buried the body. On the days following the murder, Harper told two friends he had killed the victim. He also told Bartel's brother and another friend the same account of the crime he had given Bartel. He reiterated his story to the latter. Finally, Bartel went to the police. The body was uncovered and Harper and Brown were arrested. At trial, the coroner who performed the autopsy testified he could not tell if the victim died from two of the bullet wounds first administered by Brown, parens (he testified that in his opinion, they were fatal if not immediately treated), end parens, or from Harper's shooting from the victim's temple. Acquaintances of Harper testified he had told them after the killing that the victim was still alive when he was shot in the temple. The defense consisted of Harper's claim from the witness stand that while he accompanied Brown and the victim to the murder site, he had no idea that Brown intended to kill the victim. He disclaimed any participation in the shooting. He maintained that he did not correct the misperception of others that he had participated in the murder due to his fear of Brown. The defense attacked Bartel's credibility and the defense witness testified that Bartel had told her it was he who had killed the victim.

(Decision at 11-14.)

Presiding commissioner Bryson also read the following statement prepared by a prison correctional counselor into the record:

> Harper does not dispute the facts, the reported facts of this case other than minor details. He does not dispute that there was a plan to shoot and kill the victim. His crime partner shot the victim first numerous times. Harper stated that he shot the victim once in the temple but he believes the victim was already dead. He did say though, he understands that does not make any difference. Their intent was to kill the victim. Otherwise, he does not contest the written reports in his central file.

(Id. at 14.)

/////

/////

3

ANALYSIS

I. Standards of Review Applicable to Habeas Corpus Claims

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some transgression of federal law binding on the state courts. See Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1993); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)). A federal writ is not available for alleged error in the interpretation or application of state law. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085. Habeas corpus cannot be utilized to try state issues de novo. Milton v. Wainwright, 407 U.S. 371, 377 (1972).

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Clark v. Murphy, 331 F.3d 1062, 1067 (9th Cir. 2003). Title 28 U.S.C. § 2254(d) sets forth the following standards for granting habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001). If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims. Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008). See also Frantz v. Hazey, 513 F.3d 1002, 1013 (9th Cir. 2008) (en banc) ("[I]t is now clear both that

we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

The court looks to the last reasoned state court decision as the basis for the state court judgment. Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002). When it is clear that a state court has not reached the merits of a petitioner's claim, or has denied the claim on procedural grounds, the AEDPA's deferential standard does not apply and a federal habeas court must review the claim de novo. Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

II. Petitioner's Claim

Petitioner claims that the Board's failure to find him suitable for release on parole at his February 7, 2007 suitability hearing was "arbitrary and capricious" and violated his right to due process. (Pet. at 1, 22-27.) He argues that "there was no reliable or relevant evidence in the record before the Board which rationally indicated that Mr. Harper would pose an unreasonable risk of danger to the public if released . . . ." (Id. at 2.) Petitioner also challenges the Board's decision to deny him parole for four years, where "there is no evidence that during the previous four-year refusal period issued in 2003 through 2007 Mr. Harper engaged in misconduct or failed to comply with the Board's recommendations." (Id.) Petitioner notes that he has participated in "numerous vocational, educational, self-help and therapeutic programs while incarcerated." (Id. at 6.) He argues that he has matured while in prison and that he takes full responsibility for his

part in the murder.  (Id. at 7.)  Petitioner states that he has realistic parole plans and marketable skills.  (Id. at 7.)  Petitioner argues that because he complied with all of the suggestions made by the Board Panel at his first suitability hearing, he was entitled to be found suitable for parole at his second parole suitability hearing.  (Id. at 9-20.)  He also argues that the Board's continued use of the facts of the commitment offense to find him unsuitable for parole violates due process and is barred by "issue preclusion."  (Id. at 27-32.)  Petitioner notes that even if the Board had set a release date for him at the 2007 suitability hearing, he would not be released immediately.  He argues that, although he "might pose an unreasonable danger to the public in 2007 . . ., there is not an iota of evidence indicating the he poses a threat 10 or 12 years from now."  (Id. at 32.)  Petitioner concedes that his most recent psychological evaluation opines that his current risk of dangerousness "in this institutional setting is less than average but still higher than average for the greater society."  (Id. at 7, Ex. C at 4.)

    A.  Due Process in the California Parole Context

The Due Process Clause of the Fourteenth Amendment prohibits state action that deprives a person of life, liberty, or property without due process of law.  One alleging a due process violation must first demonstrate that he was deprived of a liberty or property interest protected by the Due Process Clause and then show that the procedures attendant upon the deprivation were not constitutionally sufficient.  Ky. Dep't of Corr. v. Thompson, 490 U.S. 454, 459-60 (1989); McQuillion v. Duncan, 306 F.3d 891, 900 (9th Cir. 2002) (McQuillion I).

A protected liberty interest may arise from either the Due Process Clause of the United States Constitution or state laws.  Bd. of Pardons v. Allen, 482 U.S. 369, 373 (1987).  The United States Constitution does not, of its own force, create a protected liberty interest in a parole date, even one that has been set.  Jago v. Van Curen, 454 U.S. 14, 17-21 (1981).  However, "a state's statutory scheme, if it uses mandatory language, 'creates a presumption that parole release will be granted' when or unless certain designated findings are made, and thereby gives rise to a

/////

constitutional liberty interest." McQuillion I, 306 F.3d at 901 (quoting Greenholtz v. Inmates of Neb. Penal, 442 U.S. 1, 12 (1979)).

California's parole scheme gives rise to a cognizable liberty interest in release on parole, even for prisoners who have not already been granted a parole date. Sass v. Cal. Bd. of Prison Terms, 461 F.3d 1123, 1128 (9th Cir. 2006); Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003); McQuillion I, 306 F.3d at 903; see also In re Lawrence, 44 Cal. 4th 1181, 1204, 1210, 1221 (2008). Accordingly, this court must examine whether California provided the constitutionally-required procedural safeguards when depriving petitioner of a protected liberty interest and, if not, whether the state courts' conclusion that it did was contrary to or an unreasonable application of clearly established federal law.

In this regard, it is clearly established federal law that a parole board's decision deprives a prisoner of due process with respect to his constitutionally protected liberty interest in a parole release date if the Board's decision is not supported by "some evidence in the record." Superintendent v. Hill, 472 U.S. 445, 457 (1985); Irons v. Carey, 505 F.3d 846, 851 (9th Cir. 2007); Sass, 461 F.3d at 1128; Biggs, 334 F.3d at 915. "The 'some evidence' standard is minimally stringent," and a decision will be upheld under that standard if there is any evidence in the record that could support the conclusion reached by the factfinder. Powell v. Gomez, 33 F.3d 39, 40 (9th Cir. 1994) (citing Cato v. Rushen, 824 F.2d 703, 705 (9th Cir. 1987)). See also Toussaint v. McCarthy, 801 F.2d 1080, 1105 (9th Cir. 1986). However, "the evidence underlying the board's decision must have some indicia of reliability." Jancsek v. Or. Bd. of Parole, 833 F.2d 1389, 1390 (9th Cir. 1987). See also Perveler v. Estelle, 974 F.2d 1132, 1134 (9th Cir. 1992). Determining whether the "some evidence" standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or the weighing of evidence. Toussaint, 801 F.2d at 1105. The question is whether there is any reliable evidence in the record that could support the conclusion reached. Id.

/////

When assessing whether a state parole board's suitability decision was supported by "some evidence," the analysis "is framed by the statutes and regulations governing parole suitability determinations in the relevant state." Irons, 505 F.3d at 851. Therefore, this court must:

> look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole, and then must review the record in order to determine whether the state court decision holding that these findings were supported by "some evidence" in [petitioner's] case constituted an unreasonable application of the "some evidence" principle articulated in Hill.

(Id.)

Under California law, prisoners serving indeterminate prison sentences "may serve up to life in prison, but they become eligible for parole consideration after serving minimum terms of confinement." In re Dannenberg, 34 Cal. 4th 1061, 1078 (2005). The Board normally sets a parole release date one year prior to the inmate's minimum eligible parole release date, and does so "in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public." In re Lawrence, 44 Cal. 4th at 1202 (citing California Penal Code § 3041(a)). A release date must be set "unless [the Board] determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration . . . and that a parole date, therefore, cannot be fixed . . . ." Cal. Penal Code § 3041(b).

In order to carry out the mandate of California Penal Code § 3041, the Board must determine "whether the inmate poses 'an unreasonable risk of danger to society if released from prison,' and thus whether he or she is suitable for parole." In re Lawrence, 44 Cal. 4th at 1202 (citing California Code Regs., tit. 15, § 2281(a)). In doing so, the Board must consider all relevant, reliable information available regarding

/////

>   the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release.

Cal. Code Regs., tit. 15, § 2281(b).

The regulation identifies circumstances that tend to show suitability or unsuitability for release. Cal. Code Regs., tit. 15, § 2281(c) & (d). The following circumstances have been identified as tending to show that a prisoner is suitable for release: (1) the prisoner has no juvenile record of assaulting others or committing crimes with a potential of personal harm to victims; (2) the prisoner has experienced reasonably stable relationships with others; (3) the prisoner has performed acts that tend to indicate the presence of remorse or has given indications that he understands the nature and magnitude of his offense; (4) the prisoner committed his crime as the result of significant stress in his life; (5) the prisoner's criminal behavior resulted from having been victimized by battered women syndrome; (6) the prisoner lacks a significant history of violent crime; (7) the prisoner's present age reduces the probability of recidivism; (8) the prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release; and (9) institutional activities indicate an enhanced ability to function within the law upon release. Cal. Code Regs., tit. 15, § 2281(d).

The following circumstances have been identified as tending to indicate unsuitability for release: (1) the prisoner committed the offense in an especially heinous, atrocious, or cruel manner; (2) the prisoner had a previous record of violence; (3) the prisoner has an unstable social history; (4) the prisoner's crime was a sadistic sexual offense; (5) the prisoner had a lengthy history of severe mental problems related to the offense; and (6) the prisoner has engaged in serious misconduct in prison. Cal. Code Regs., tit. 15, § 2281(c). Factors to consider in deciding whether the prisoner's offense was committed in an especially heinous, atrocious, or

cruel manner include: (A) multiple victims were attacked, injured, or killed in the same or separate incidents; (B) the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (C) the victim was abused, defiled or mutilated during or after the offense; (D) the offense was carried out in a manner that demonstrated an exceptionally callous disregard for human suffering; and (E) the motive for the crime is inexplicable or very trivial in relation to the offense.  Id. § 2281(c)(1)(A) - (E).

The overriding concern in determining parole suitability in California is public safety.  Dannenberg, 34 Cal. 4th at 1086.  This "core determination of 'public safety' . . . involves an assessment of an inmates current dangerousness."  Lawrence, 44 Cal. 4th at 1205 (emphasis in original).  See also Cal. Code Regs. tit. 15, § 2281(a) ("Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.")  Accordingly, under California law,

> when a court reviews a decision of the Board or the Governor, the relevant inquiry is whether some evidence supports the decision of the Board or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings.

Lawrence, 44 Cal. 4th at 1212 (citing In re Rosenkrantz, 29 Cal. 4th 616, 658 (2002); Dannenberg, 34 Cal. 4th at 1071; and In re Lee, 143 Cal. App. 4th 1400, 1408 (2006)).

In recent years the Ninth Circuit Court of Appeals has concluded that, given the liberty interest that California prisoners have in their release on parole, a continued reliance upon an unchanging factor to support a finding of unsuitability for parole may, over time, constitute a violation of due process.  The court has addressed the issue in three significant cases, each of which will be discussed below.
First, in Biggs, the Ninth Circuit Court of Appeals recognized that a continued reliance on an unchanging factor to deny parole, such as the circumstances of the offense, could at some point
/////

result in a due process violation.[1]  While the court in Biggs rejected several of the reasons given by the Board for finding the petitioner in that case unsuitable for parole, it upheld three:  (1) petitioner's commitment offense involved the murder of a witness; (2) the murder was carried out in a manner exhibiting a callous disregard for the life and suffering of another; and (3) petitioner could benefit from therapy.  Biggs, 334 F.3d at 913.  However, the court in Biggs cautioned that continued reliance solely upon the gravity of the offense of conviction and petitioner's conduct prior to committing that offense in denying parole could, at some point, violate due process.  In this regard, the court observed:

> As in the present instance, the parole board's sole supportable reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law.  Over time, however, should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole.

Id. at 916.  The court in Biggs also stated that "[a] continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation."  Biggs. 334 F.3d at 917.

In Sass, the Board found the petitioner unsuitable for parole at his third suitability hearing based on the gravity of his offenses of conviction in combination with his prior offenses. 461 F.3d at 1126.  Citing the decision in Biggs, the petitioner in Sass contended that reliance on these unchanging factors violated due process.  The court disagreed, concluding that these factors amounted to "some evidence" to support the Board's determination.  Id. at 1129.  The court provided the following explanation for its holding:

/////

---

[1] That holding has been acknowledged as representing the law of the circuit.  Irons, 505 F.3d at 853; Sass, 461 F.3d at 1129.

11

>While upholding an unsuitability determination based on these same factors, we previously acknowledged that "continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and *could* result in a due process violation." Biggs, 334 F.3d at 917 (emphasis added).  Under AEDPA it is not our function to speculate about how future parole hearings could proceed.  Cf. id.  The evidence of Sass' prior offenses and the gravity of his convicted offenses constitute some evidence to support the Board's decision.  Consequently, the state court decisions upholding the denials were neither contrary to, nor did they involve an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States.  28 U.S.C. § 2254(d).

Id.

In Irons, the Ninth Circuit sought to harmonize the holdings in Biggs and Sass, stating as follows:

>Because the murder Sass committed was less callous and cruel than the one committed by Irons, and because Sass was likewise denied parole in spite of exemplary conduct in prison and evidence of rehabilitation, our decision in Sass precludes us from accepting Irons' due process argument or otherwise affirming the district court's grant of relief.
>
>We note that in all the cases in which we have held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence.  Specifically, in Biggs, Sass, and here, the petitioners had not served the minimum number of years to which they had been sentenced at the time of the challenged parole denial by the Board.  Biggs, 334 F.3d at 912; Sass, 461 F.3d at 1125.  All we held in those cases and all we hold today, therefore, is that, given the particular circumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms.
>
>Furthermore, we note that in Sass and in the case before us there was substantial evidence in the record demonstrating rehabilitation. In both cases, the California Board of Prison Terms appeared to give little or no weight to this evidence in reaching its conclusion that Sass and Irons presently constituted a danger to society and thus were unsuitable for parole.  We hope that the Board will come to recognize that in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his

12

|   |   |
|---|---|
| 1 | rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes. <u>Biggs</u>, 334 F.3d at 917. |
| 2 |   |

<u>Irons</u>, 505 F.3d at 853-54.[2]

B. <u>Analysis</u>

In addressing the factors it considered in reaching its February 7, 2007 decision that petitioner was unsuitable for parole at that time, the Board in this case stated as follows:

> Thank you very much. We've reconvened for the Decision in the matter of John Harper. Sir, the panel reviewed all information received from the public and relied on the following circumstances in concluding that you are not yet suitable for parole and would pose an unreasonable risk of danger to society, or a threat to public safety if released from prison. This offense was carried out in an especially cruel and callous manner in that the victim, Bryan Denahill, 17 year old male was particularly vulnerable that he and offenders, you and your crime partners were friends, partners in drugs and other crimes. On June 9th of 1985, the victim was lured to the remote area of San Bernardino County by you and Brown under the pretense of splitting $6000 worth of cash and drugs stolen from a drug dealer. He went to sand canyon to help retrieve it. The murder weapon had been stashed earlier the same day and you knew of its presence. When they got to the area, Brown retrieved the gun and shot the victim. The gun chamber jammed. The wounded victim ran into the bushes. Brown cleared the weapon and chased him, shooting him several more times. Harper, that is you, then took possession of the gun, picked up the victim's head by the hair and fired a fatal bullet into his temple. This offense was carried out dispassionately and in a calculated manner. Fearing the victim was still alive, you struck him on the back of the head several times with a rock. Returning to Harper's house, Harper and Brown told Bartel what they'd done, calling it 'first degree premeditated murder'. This victim was abused and mutilated during the commission of the offense. The acquaintances of Harper testified, he told them after the killing that

---

[2] The California Supreme Court has also acknowledged that the aggravated nature of the commitment offense, over time, may fail to provide some evidence that the inmate remains a current threat to public safety. <u>In re Lawrence</u>, 44 Cal. 4th at 1218-20 & n. 20. Additionally, a recent panel of the Ninth Circuit in <u>Hayward v. Marshall</u>, 512 F.3d 536, 546-47 (9th Cir. 2008), determined that under the "unusual circumstances" of that case the unchanging factor of the gravity of the petitioner's commitment offense did not constitute "some evidence" supporting the governor's decision to reverse a parole grant on the basis that the petitioner would pose a continuing danger to society. However, on May 16, 2008, the Court of Appeals decided to rehear that case en banc. <u>Hayward v. Marshall</u>, 527 F.3d 797 (9th Cir. 2008). Therefore, the panel decision in <u>Hayward</u> is no longer citable precedent.

13

|    |    |
|----|----|
| 1  | the victim was still alive when he was shot in the temple. Sir, you |
| 2  | do not have a, a significantly large criminal history. However, you did, you were very frank with the Panel today and you did admit to |
| 3  | polysubstance abuse at an early age. You've explained in some detail your upbringing but you also said, at the end of all that, that, |
| 4  | in fact, you had good values from your upbringing. As to your institutional behavior, you have programmed commendably as to |
| 5  | your prison work and that has been read into the record. You obviously have a work ethic and that's excellent and will serve you |
| 6  | when you do get paroled. You are also, you've also worked at Coastline College on Coastline College courses and that's to your |
| 7  | credit and also very important for you. Obviously, you're very bright and it's obvious that you need to work your mind as well as |
| 8  | your body. You received certification in the meat cutting field in 2004 and you explained that that involves warehouse management |
| 9  | as well. You also expressed a desire to evolve in to [sic] mill and cabinetry and that you have most of the training completed in that |
| 10 | field. So you have two very marketable skills. As to self help and therapy, as has been read into the file, you have an especially |
| 11 | recently [sic] participated in self help courses. You have, and again you have been frank with the Panel, not yet started really working |
| 12 | the steps in the step program but you have taken NA several times through '94, 2000, 2001, 2002 and 2006. As to your misconduct in |
| 13 | prison, you do have a significant record of disciplinary violations, totaling eight 115s, the last in 2002 for possession of tattoo |
| 14 | paraphernalia prior to that was 2001 for mutual combat. So you appear to have made great strides and are now, at least for the last |
| 15 | basically five years, been disciplinary free and that's to your credit also. As to the psychological report dated December 12, 2006 by |
| 16 | John T. Rouse, Ph.D. He assigns you a very high global assessment functioning of 85 which we feel is true. But he also |
| 17 | assigns you although a lower than average risk of prison comparable dangerousness, prison inmate type of dangerousness. |
| 18 | He finds you have greater than average risk of dangerousness in the greater society and I'm ready to address that separately in a |
| 19 | moment. As to your parole plans, you do appear to be, to have viable residential plans and you also have acceptable employment |
| 20 | skills. As to Penal Code 3042 responses, responses indicate opposition to a finding of parole suitability specifically by the |
| 21 | District Attorney of San Bernardino County. In a separate decision, the hearing Panel finds it is not reasonable to expect that |
| 22 | parole would be granted at a hearing during the following four years. Specific reasons for this finding are as follows. Sir, this was |
| 23 | a horrific crime. It was not just a murder first but this crime far exceeds the minimum necessary to constitute this offense. This |
| 24 | offense was carried out cruelly and callously. The victim was particularly vulnerable as he and you were friends, partners in |
| 25 | drugs and other crimes. On June 9th of 1985, this victim was lured to a remote area of San Bernardino County by you and Brown |
| 26 | under the pretense of splitting money and drugs stolen from the drug dealer. If, on the proviso, that he went to sand canyon to help |

retrieve it and once there, he was murdered.  The murder weapon had been stashed earlier the same day.  You knew of its presence when you got to the area.  Brown retrieved the gun, shot the victim.  He fled trying to escape into the bushes.  Brown chased him and shot him again and then you took possession of the gun, picked him up and in execution style, fired the fatal bullet into his temple.  Fearing he was still alive, you struck him on the back of the head several times with a rock then returning back to your residence, you basically tagged it as first degree premeditated murder and acquaintances of yours testified that after the killing, he was, you said that he was still alive when you shot him in the temple.  This offense was carried out in a manner demonstrating exceptionally callous disregard for human suffering.  Part of that time, he must have been in terrible fear for his life and it must have been a painful way to die.  You had a clear opportunity to cease but you continued.  Moreover, the motive for this crime was very trivial in relation to the offense.  In fact, the next day, the offenders returned to the scene with Bartel and re-enacted the offense, buried the body deep in the ground to avert discovery and on the days following the murder, you told friends that you had killed the victim.  Sir, this Panel believes you're developing insight and actually, you expressed that insight unusually well.  You're unusually articulate in that regard and we, however, concur with the assessment of the psychologist at this point because we feel that, we don't know exactly where he derived his assessment but we do agree with the assessment and first of all, let me tell you this, it is not our objective to keep you incarcerated.  I don't know of any Panel's objective that would be that but it is certainly not ours.  It gives us no pleasure to give denials and we understand that we make a little check mark in a box but that is your life and you have to go live that but we have to look at what is really reasonable and what, what do we want you to do so that society can feel that you won't be a threat any longer.  We felt today that you were honest and genuine and forthcoming.  We also feel you're incredibly vulnerable and fragile still at this point.  And that's what concerns us.  We're concerned that it may be your perception that it is rough in here.  There's no doubt about it and it is difficult in so many ways.  We don't minimize that.  But actually, the challenge is [sic] outside are very great as well and it's not getting any easier outside.  What we're concerned about is that you have the tools to go forth and not feel that you have to be subject in any way to the approval by others, to groupthink, as you really adequately addressed, but that you will have everything you need to be reliable and to feel that you're your own person, that you don't need to worry about what others think or how they perceive you so that you can feel less victimized by your life's circumstances whatever they may turn out to be, good or bad.  So, we ask that you review this transcript and think about what you said and how you said it as well as what was said by the other parties here today and let me tell you something.  We can't forgive you.  And in many ways, you have to forgive yourself and that may be the hardest thing.  It's going to be the

15

>hardest thing for you to do.  You have to find a way to do that and perhaps by reaching out to others as well as all the other things you're doing.  It's going to be really important for you because in reaching out to others, you'll make yourself vulnerable every time you do and the more you do that, the more capability you have and the stronger you'll feel.  Do you have anything to add, Commissioner?  I really wish you good luck, sir.

(Decision at 62-68.)  After taking into consideration the Ninth Circuit decisions in Biggs, Sass, and Irons, and for the reasons set forth below, this court concludes that petitioner is not entitled to federal habeas relief with respect to his due process challenge to the Board's February 7, 2007 decision denying him parole.

      First, and perhaps most importantly, at the time of the challenged parole suitability hearing, petitioner had not yet served the minimum number of years required by his sentence on the commitment offense.  Petitioner was sentenced to 27 years-to-life in state prison in 1987, and the parole hearing at issue was held 20 years later, in 2007.  Pursuant to the holding in Irons, petitioner's right to due process was not violated when he was deemed unsuitable for parole prior to the expiration of his minimum term.  Irons, 505 F.3d at 665.  Further, the Board's 2007 decision that petitioner was unsuitable for parole and that his release would unreasonably endanger public safety was supported by "some evidence" that bore "indicia of reliability." Jancsek, 833 F.2d at 1390.  The Board relied on the circumstances of petitioner's offense of conviction, the fact that he had only recently begun to participate in self-help programs and had not yet started "working the steps in the step program," his significant record of prison disciplinary violations, and the most recent psychological report which opined that petitioner's risk of dangerousness was greater than average when compared to persons outside prison. According to the authorities cited above, these factors constitute "some evidence" supporting the Board's decision that petitioner was not yet suitable for release on parole in 2007, especially where he had not yet served the minimum term required by his sentence.  Sass, 469 F.3d at 1129; Irons, 505 F.3d at 665.  This is true even though petitioner has participated in self-help programs and may have a place to live and job prospects upon release from prison.

The Board's 2007 decision that petitioner was unsuitable for parole and would pose a danger to society if released meets the minimally stringent test set forth in <u>Biggs</u>, <u>Sass</u>, and <u>Irons</u>. Accordingly, petitioner is not entitled to federal habeas relief on his claim that the Board's failure to find him suitable for parole at the February 7, 2007 suitability hearing violated his right to due process. <u>Sass</u>, 461 F.3d at 1129; <u>Irons</u>, 505 F.3d at 664-65.

## CONCLUSION

For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within seven days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: March 23, 2010.

_____
DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:8:
harper1410.hc

17